[50 NYS3d 13]

Natixis Real Estate Capital Trust 2007-HE2, by Wells Fargo Bank, National Association, as Securities Administrator, Respondent, v Natixis Real Estate Holdings, LLC, Appellant.

First Department, March 9, 2017

APPEARANCES OF COUNSEL

*Davis & Gilbert LLP*, New York City (*Bruce M. Ginsberg, Joseph Cioffi, James R. Serritella* and *Massimo Giugliano* of counsel), for appellant.

*Quinn Emanuel Urquhart & Sullivan, LLP*, New York City (*Andrew Dunlap, Philippe Z. Selendy, Maya D. Cater* and *Stephen Schweizer* of counsel), for respondent.

## OPINION OF THE COURT

RENWICK, J.

This appeal stems from a transaction involving residential mortgage backed securities (RMBS). Plaintiff, the administrator of the securitized trust, seeks to enforce the loan repurchase rights, more commonly referred to as putback rights, against defendant sponsor of the securitized transaction for breach of the representations and warranties defendant made regarding the quality of the mortgage loans. This action raises a number of issues that regularly recur in putback actions, including whether the action was timely commenced, whether or not the action is unripe for failing to comply with a condition precedent to commencement of the action, and whether plaintiff adequately pleaded a cause of action for breach of the representations and warranties. This action also raises an issue of

first impression of whether enforcement of putback rights is within the exclusive domain of an RMBS's trustee so as to deny plaintiff securities administrator standing to commence this action.

### Factual and Procedural Background

In its role as sponsor of the securitization that is at the core of this case, defendant Natixis Real Estate Holdings, Inc. (Natixis) purchased 4,704 residential mortgage loans worth more than $877 million pursuant to a mortgage loan purchase agreement (MLPA). The MLPA contains numerous representations and warranties from the loan originators (originators' warranties) about the quality of the loans. Natixis then sold the loans to a passthrough deposit entity, Morgan Stanley ABC Capital I, Inc. (depositor), pursuant to an unaffiliated seller agreement (SA). In the SA, Natixis made several representations and warranties to the depositor, which were separate and independent from those issued by the originators in the MLPA.

Morgan Stanley then deposited the loans, including the representations and warranties in the MLPA and SA, into a securitized trust pursuant to a pooling and servicing agreement (PSA). The parties to the PSA included Morgan Stanley, as depositor, Deutsche Bank National, as the trustee, and Wells Fargo, NA, as securities administrator. The individual mortgage loans served as collateral for the certificates issued by the trustee, who paid principal and interest to certificate holders from the cash flow generated from the mortgage loan payments. Thus, the certificate holders made money when the borrowers made payments to the loans. The trust held legal title to the mortgages and the trustee was responsible for them. The securities administrator is the trust's collection agent pursuant to the PSA.

Putback actions are typically brought by a trustee on behalf of the trust (securitization vehicle) asserting claims of breach of contract (see Haig, Commercial Litigation in New York State Courts § 91:9 at 888 [4th ed 4C West's NY Prac Series 2015]). In this case, however, it is the securities administrator who brings the breach of contract claims against the sponsor, Natixis.* The complaint alleges that the PSA transaction imposes an obligation upon Natixis to repurchase the loans because it breached the SA representations and warranties. In

---

\* On June 5, 2013, Wells Fargo appointed Computershare as separate securities administrator. The appointment authorized Computershare to take

addition, plaintiff avers that Natixis had the "backstop" obligation to repurchase defective loans that breached the originators' representations and warranties, once the originators failed to cure or repurchase them.

As indicated, the complaint alleges breaches of two sets of representations and warranties, each of which independently triggers a duty to repurchase the defective loans: (i) the warranties made by the originators in the MLPA and the assignment and recognition agreements (originator warranties); and (ii) the warranties made by Natixis in the SA (SA warranties).

The originator warranties in the MLPA include, among others, that "[n]o fraud, error, omission, misrepresentation, negligence or similar occurrence" had occurred on the part of any person; that borrowers "had a reasonable ability to make timely payments" on the mortgage; that each pool of loans complied with the relevant originators' underwriting guidelines; and that "the information set forth in the mortgage loan schedule was true and correct." According to the MLPA, the complaint continues, if any of these originator warranties were false, the relevant originator was required to repurchase any affected loans within 60 days of the originator's discovery or receipt of notice of that breach. As backstop duties, the PSA required Natixis to repurchase any loan that breached the MLPA representations and warranties if the originators failed to repurchase the defective loans pursuant to the MLPA.

Finally, the complaint avers that Natixis and the depositor also executed the SA on the closing date. In the SA, Natixis transferred the loans to the depositor and made the SA warranties. The SA warranties include, among other things, that no event had occurred that would render the originators' warranties untrue, that the loans were not selected in a manner adverse to the trust; and that the loans complied with all applicable law. The PSA required Natixis to repurchase all loans that breach the SA's representations and warranties within 90 days of its discovery or receipt of notice of such breach.

Natixis moved to dismiss the complaint arguing that plaintiff: (1) as securities administrator, lacked standing to sue; (2) failed to comply with certain conditions precedent prior to commencing the action; (3) failed to timely commence the action; and (4) failed to sufficiently plead a breach of contract

---

actions on behalf of the trust for purposes of enforcing repurchase obligations, including commencing and prosecuting this litigation.

claim based upon a breach of the SA representations and warranties. Supreme Court declined to dismiss the action (or any claim) on such grounds (2015 NY Slip Op 32360[U] [2015]). We now affirm for the reasons explained below.

## Discussion

### Standing

■ We begin by examining the threshold question of standing. We find that Supreme Court properly held that the securities administrator has standing to prosecute this action. To be sure, we recognize that an RMBS trust is not unlike a typical common-law trust in which the trustee (rather than the trust itself, which is a legal fiction) holds the asset for the benefit of the certificate holders (who are the beneficiaries of the trust) (*see Beck v Manufacturers Hanover Trust Co.*, 218 AD2d 1, 12 [1st Dept 1995]). Under such legal structure, we agree with Natixis, that the trustee itself is recognized under New York Law as the party in interest for the purpose, among others, of defending the interest of the trust. We disagree, however, with Natixis's argument that only a trustee of an express trust has the authority to commence an action in an RMBS trust.

Natixis's argument is based on a misunderstanding of the role of the securities administrator of an RMBS trust. A trust holds legal title to the mortgage, but delegates equitable ownership to the special servicer, the securities administrator, who administers the trust pursuant to a pooling and servicing agreement (PSA) (*see CWCapital Asset Mgt., LLC v Chicago Props., LLC*, 610 F3d 497 [7th Cir 2010]). Here, the securities administrator is not claiming standing by virtue of the trustee's delegation of its discretionary power, but rather based on the authority of the PSA (*id.; see also Hildene Capital Mgt., LLC v Bank of N.Y. Mellon*, 105 AD3d 436 [1st Dept 2013] [party had standing based upon the contractual duties it assumed under the indenture]; *cf. Sprint Communications Co. v APCC Services, Inc.*, 554 US 269 [2008] [Supreme Court held that an assignee for collection has standing to sue, within the meaning of article III of the Constitution]). Thus, in answering the question of whether the securities administrator can bring suit, on its own, on behalf of the trust and certificate holders, the Court must look at the language of the relevant PSA.

Here, under the plain language of the PSA, the securities administrator has broad authority to act alone in performing its duties, including the right to prosecute legal action. Specifically, section 10.02 (viii) of the PSA provides in pertinent part:

"The Securities Administrator shall have no obligation to appear in, prosecute or defend any legal action that is not incidental to its duties hereunder and which in its opinion may involve it in any expense or liability; provided, however that the Securities Administrator may in its discretion undertake any such action that it may deem necessary or desirable in respect of this Agreement and the rights and duties of the parties hereto and the interests of the Trustee, The Securities Administrator and the Certificate holders hereunder."

Natixis, however, argues that the PSA's full power and authority granted to the securities administrator to act alone, and which includes prosecuting or defending any action, is limited by section 2.03 (g) of the PSA, which provides in pertinent part:

"It is understood and agreed that the obligation under this Agreement of any Person to cure, repurchase or replace any Mortgage Loan as to which a breach has occurred and is continuing shall constitute the sole remedy against such Persons respecting such breach available to Certificate holders, the Depositor, the Unaffiliated Seller, the Custodian, The Securities Administrator or the Trustee on their behalf. In the event such required repurchase or replacement does not occur, the Securities Administrator shall take such actions as directed upon written direction from the Depositor and the provision of reasonable indemnity satisfactory to the Securities Administrator in accordance with sections 6.03 and 10.02."

In our view, however, such language does not constitute any limitation on the securities administrator's full power and authority to act alone pursuant to its duties. "[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms" (*Greenfield v Philles Records*, 98 NY2d 562, 569 [2002]). The agreement must be "read as a whole to determine its purpose and intent" (*W.W.W. Assoc. v Giancontieri*, 77 NY2d 157, 162 [1990]). "It is a cardinal rule of contract construction that a court should 'avoid an interpretation that would leave contractual clauses meaningless'" (*150 Broadway N.Y. Assoc., L.P. v Bodner*, 14 AD3d 1, 6 [1st Dept 2004]). Moreover, "conflicting

contract provisions should be harmonized, if reasonably possible, so as not to leave any provision without force and effect" (*Isaacs v Westchester Wood Works*, 278 AD2d 184, 185 [1st Dept 2000]).

Applying these principles, this Court interprets the PSA according to its terms because it is clear and complete (*see W.W.W. Assoc.*, 77 NY2d at 160-161). Based upon its plain language, section 2.03 (g) of the PSA simply requires the securities administrator to take action as directed by the depositor, subject to indemnity. Nothing contained in section 2.03 of the PSA limits the securities administrator's right to act under other provisions of the PSA, such as section 10.02 (viii), which broadly authorizes the securities administrator to take action in its discretion in the interest of the trust and certificate holders.

Contrary to Natixis's allegations, there is nothing conflicting or inconsistent about section 2.03 and section 10.02 (viii). The sections are complementary; the former is mandatory, while the latter is permissive. In other words, the securities administrator is required to act (and entitled to indemnification) when directed by the depositor. Otherwise, the securities administrator is free to act on its own initiative, in the interest of the trust and certificate holders, where the depositor has not issued a written direction.

Statute of Limitations

We next examine Natixis's argument that the entire action must be dismissed as untimely commenced. A breach of contract cause of action generally must be commenced within six years of the breach (*see* CPLR 203 [a]; 213 [2]; *Town of Oyster Bay v Lizza Indus., Inc.*, 22 NY3d 1024, 1030 [2013]). Natixis contends that this action is time-barred because the PSA is dated "as of April 1, 2007," but plaintiff did not sue until April 30, 2013, i.e., more than six years later. This type of argument has been rejected by this Court.

This Court has held that a claim for breach of warranty accrues at the time the contract is executed, not on its "as of" date (*U.S. Bank N.A. v DLJ Mtge. Capital, Inc.*, 121 AD3d 535, 536 [1st Dept 2014] ["If a contractual representation or warranty is false when made, a claim for its breach accrues at the time of the execution of the contract. This is true even where the contract states that its 'effective date' is earlier" (citation omitted)]).

Here, the PSA was executed on April 30, 2007. The trust at issue closed on April 30, 2007. Moreover, the PSA defines "Clos-

ing Date" as April 30, 2007. Thus, April 30, 2013 (the date plaintiff commenced this action) was the last day on which plaintiff could sue, and the action is therefore timely (*see ACE Sec. Corp. v DB Structured Prods., Inc.*, 112 AD3d 522, 523 [1st Dept 2013], *affd* 25 NY3d 581 [2015] ["(T)he claims accrued on the closing date of the MLPA, March 28, 2006 . . . The certificate holders commenced an action . . . on March 28, 2012, the last day of the limitations period"]).

Natixis sets forth no convincing reason why this Court should depart from stare decisis. On the contrary, this Court's rationale in *U.S. Bank N.A.* makes perfect sense:

> "The claim cannot accrue earlier [than the date the contract is executed], because until there is a binding contract, there can be no claim for breach of warranty. Additionally, in the residential mortgage-backed securities . . . context, . . . the claim cannot generally accrue before the contract, because the trust that is the recipient of the representations and warranties typically does not come into existence prior to the closing of the transaction. Furthermore, the representations and warranties were made as of the closing date" (121 AD3d at 536 [citations omitted]).

## Pleading Deficiencies Argument with Regard to Breach of the SA Representations and Warranties

As a prelude to examining Natixis's argument that the repurchase obligations are not yet ripe for adjudication, this Court must examine Natixis's pleading deficiencies argument as to the repurchase claim. Natixis concedes that plaintiff has sufficiently pleaded the required factual predicate for its backstop repurchase obligations, namely a breach of the originators' representations and warranties. Defendant, however, argues that plaintiff did not sufficiently plead the required factual predicate for the repurchase obligations, namely Natixis's breach of the SA representations and warranties.

Pursuant to CPLR 3211 (a) (7), a motion to dismiss for failure to state a cause of action lies if the pleading is defective on its face. When a motion attacks the pleading on its face, the allegations of the pleading are deemed to be true (*see Foley v D'Agostino*, 21 AD2d 60 [1st Dept 1964]). More than that, the pleading will be deemed to allege whatever may be implied from its statements by reasonable intention (*id.* at 65). The

pleader is entitled to every favorable inference that might be drawn (*Westhill Exports v Pope*, 12 NY2d 491, 496 [1963]). Hence, to succeed on a CPLR 3211 (a) (7) motion to dismiss, the moving party "must convince the court that nothing the plaintiff can reasonably be expected to prove would help; that the plaintiff just doesn't have a claim" (Siegel, NY Prac § 265 at 462 [5th ed 2011]; *accord* John R. Higgitt, *CPLR 3211 [a] [1] and [a] [7] Dismissal Motions—Pitfalls and Pointers*, 83 NY St BJ 32, 33-34 [Nov./Dec. 2011]).

In the complaint in the instant case, plaintiff cites to two types of SA representations and warranties, a breach of either allegedly triggers Natixis's repurchase obligations. First, plaintiff cites to section 3.01 (J) of the SA in which Natixis represents and warrants that the mortgage loans it selected to include in the RMBS trust were "not intentionally selected [by it] in a manner so as to affect adversely the interest of the Depositor." On appeal, however, plaintiff no longer contends that a breach of such representations and warranties triggers a duty to repurchase any defective loan (*see* PSA section 2.03).

Second, the complaint cites to section 3.03 of the SA, a breach of which does trigger a duty to repurchase defective loans. The section states:

> "Section 3.03 <u>Further Representations and Warranties</u>.
>
> "(a) The Unaffiliated Seller represents and warrants to the Depositor and its assignees that with respect to each representation and warranty made by an Originator who is a party to an Assignment and Recognition Agreement as of a date earlier than the Closing Date, no event has occurred from the applicable date as of which such representation and warranty is made to the closing Date, including, but not limited to, the passage of time, which would render such representation and warranty untrue in any material respect as of the Closing Date."

Contrary to Natixis's contention, the complaint contains sufficient factual allegations as to the type of "event" that occurred prior to the closing date that rendered the originators' representations and warranties "untrue in [a] material respect as of the Closing Date." Specifically, plaintiff alleges that "based on the due diligence [Natixis] conducted on the loans and/or

the Originators, Natixis discovered that certain loans breached the representations." Such factual allegations are sufficiently particular to give the court and parties notice of the material elements of the repurchase claim predicated upon a breach of the SA representations and warranties.

Condition Precedent

■ Having found the pleadings sufficient—with regard to the repurchase obligations based upon the breach of SA representations and warranties, and the backstop repurchase obligations based upon the breach of the originators' representations and warranties—we must next examine Natixis's argument that such well-pleaded claims were unripe because plaintiff failed to demonstrate compliance with a condition precedent to commencement of the action. Natixis's argument centers on section 2.03 (d) of the PSA, the repurchase protocol, which provides in pertinent part:

> "Within 90 days of the earlier of either discovery by or notice to the Unaffiliated Seller of any breach of a representation or warranty set forth in Section 3.01(f), 3.01(h), 3.01(n), 3.01(o), 3.01(p) or 3.03 of the Unaffiliated Seller's Agreement that materially and adversely affects the value of the Mortgage Loans or the interest of the Trustee or the certificate holders therein, the Unaffiliated Seller shall use its best efforts to cure such breach in all material respects and, if such breach cannot be remedied, the Unaffiliated Seller shall, (i) if such 90-day period expires prior to the second anniversary of the related Delivery Date, remove such Mortgage Loan from the Trust Fund and substitute in its place a Substitute Mortgage Loan, in the manner and subject to the conditions set forth in this Section 2.03; or (ii) repurchase such Mortgage Loan at the Repurchase Price . . . .
>
> "In the event there is a breach of a representation or warranty by an Originator with respect to a Mortgage Loan originated or acquired by such Originator that materially and adversely affects the value of such Mortgage Loan or the interest of the Trustee and the Certificateholders therein, and, upon discovery or receipt of notice, such Originator fails to cure, substitute or repurchase such Mortgage Loan within the period specified in either the

applicable Assignment and Recognition Agreement, if any, or the applicable Mortgage Loan Purchase Agreement, the Unaffiliated Seller shall cure, substitute or repurchase such Mortgage Loan subject to the conditions set forth in this Section 2.03 . . . . Notwithstanding the unaffiliated Seller's lack of knowledge, in the event it is discovered by the Unaffiliated Seller, the Depositor or the Trust (including the Trustee and the Servicer acting on the Trust's behalf), that the substance of a representation or warranty was inaccurate as of the applicable date of such representation or warranty and such inaccuracy materially and adversely affects the value of the related Mortgage Loan, the Unaffiliated Seller shall use its best efforts to cure such breach or substitute or repurchase such Mortgage Loan in accordance with this Section 2.03 (d)."

To Natixis, this dual repurchase protocol operates as an express condition precedent to suing because it indicates that plaintiff may not enforce Natixis's repurchase obligations unless it complies with the 90-day demand-and-cure period. That is, a plaintiff must provide notice and await the required amount of time. We agree with Natixis that this type of cure and repurchase provision constitutes a procedural condition precedent to suit as it acts as a means of obtaining relief (*see ACE Sec. Corp., Home Equity Loan Trust, Series 2006-SL2 v DB Structured Prods., Inc.*, 25 NY3d 581, 598 [2015]; *U.S. Bank N.A. v DLJ Mtge. Capital, Inc.*, 141 AD3d 431, 432 [1st Dept 2016]).

However, we reject Natixis's contention that it was entitled to a 90-day cure-and-demand period irrespective of whether it discovered any breach of the representations and warranties. On the contrary, the repurchase protocol (section 2.03 [d] of the PSA cited above) explicitly provides that Natixis's repurchase obligations are triggered by "either *discovery* by or notice to [Natixis] of any breach of" (emphasis added) the SA representations and warranties. Similarly, the same repurchase protocol explicitly provides that Natixis's backstop repurchase obligations are triggered: "[If] upon *discovery* or receipt of notice, such Originator fails to cure, substitute or repurchase such Mortgage Loan within the period specified" (emphasis added).

This Court has recognized that these alternative contractual obligations give rise to separate and distinct claims for breach of contract (*Morgan Stanley Mtge. Loan Trust 2006-13ARX v Morgan Stanley Mtge. Capital Holdings LLC*, 143 AD3d 1, 3 [1st Dept 2016]; *Nomura Home Equity Loan, Inc., Series 2006-FM2 v Nomura Credit & Capital, Inc.*, 133 AD3d 96, 108 [1st Dept 2015]). Thus, under the PSA's repurchase protocol a discovery of a breach of the pertinent representations and warranties and the failure to cure them triggered Natixis's repurchase and backstop repurchase obligations.

Additionally, Natixis's argument fails common sense. Carried to its logical conclusion, Natixis's argument amounts to the position that even where Natixis discovered its own breach of representations and warranties or where a discovery of a breach of the originators' representations and warranties triggered Natixis's duties to cure or repurchase the defective loans, failure to do so carried no contractual repercussions unless someone other than Natixis also concomitantly discovered the breaches of representations and warranties and provided Natixis notice thereof. Thus, Natixis's reading of the repurchase protocol allows it to sit on its hands after discovery of its own breaches or breaches by the originators merely because no one else has discovered them. Of course, this would effectively nullify the discovery language of the repurchase protocol contained in section 2.03 (d) of the PSA. It would turn a blind eye to the cardinal principle of contract interpretation that "[a] contract should not be interpreted to produce a result that is absurd . . . commercially unreasonable[,] or contrary to the reasonable expectations of the parties" (*Matter of Lipper Holdings v Trident Holdings*, 1 AD3d 170, 171 [1st Dept 2003] [citations omitted]).

Still, Natixis argues that even if this action is ripe for adjudication, the complaint must be dismissed because it fails to sufficiently plead Natixis's discovery of the breach of the pertinent representations and warranties with regard to the loans. The complaint in the instant action alleges that "Natixis purchased the Loans from the Originators, had the loan files in its possession, and hand-picked the Loans it securitized and sold to the Trust." The complaint goes further to aver that Natixis's due diligence included "reviewing select financial information for credit and risk assessment, conducting an underwriting guideline review, and performing senior level management interviews and/or background checks." Moreover,

the complaint alleges that at least 60% of the loans in the Trust are defective, and that Natixis's due diligence "would have revealed that Loans were plagued with defects." In addition, the complaint alleges that a forensic study into the credit quality and characteristics of the loans revealed pervasive misrepresentations, "widespread underwriting guideline violations" by the originators, and "material inaccuracies in the Mortgage Loan Schedule."

We find such allegations sufficient to adequately plead that Natixis's repurchase and backstop repurchase obligations were triggered by defendant's discovery of its own breaches of the SA representations and warranties and the breaches of the originators' representations and warranties with regard to the mortgage loans. Indeed, these allegations are factual allegations, not just legal conclusions. The complaint does not simply assert, without more, that a certain number of loans breached the originators' representations and warranties. Instead, the complaint avers which representations and warranties were breached and how. Thus, plaintiff's allegations that Natixis discovered the aforementioned breaches are sufficient to survive a motion to dismiss on the pleadings.

Accordingly, the order of the Supreme Court, New York County (Marcy S. Friedman, J.), entered on or about July 2, 2015, which, insofar as appealed from, denied defendant's motion to dismiss the complaint pursuant to CPLR 3211, should be affirmed, with costs.

FRIEDMAN, J.P., FEINMAN, GISCHE and KAPNICK, JJ., concur.

Order, Supreme Court, New York County, entered on or about July 2, 2015, affirmed, with costs.