Manhattan Chrystie St. Dev. Fund, LLC v Witkoff Group LLC (2023 NY Slip Op 50622(U))

[*1]

Manhattan Chrystie St. Dev. Fund, LLC v Witkoff Group LLC

2023 NY Slip Op 50622(U)

Decided on June 26, 2023

Supreme Court, New York County

Reed, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on June 26, 2023
Supreme Court, New York County

Manhattan Chrystie Street Development Fund, LLC, Plaintiff,

against
The Witkoff Group LLC, IS Development LLC, Defendant.

Index No. 656516/2021

Attorneys for the Plaintiff: 
David J Lender of Weil Gotshal & Manges
Attorneys for the Defendants:
Remy J Stocks of Meister Seelig & Fein
Eva Marie Sullivan of Meister Seelig & Fein

Robert R. Reed, J.

The following e-filed documents, listed by NYSCEF document number (Motion 001) 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20 were read on this motion to/for DISMISSAL.
Plaintiff Manhattan Chrystie Street Development Fund, LLC ("plaintiff" or "PEP member") brings this action against defendants, the Witkoff Group LLC ("TWG") and IS Development LLC ("ISD," and together with TWG, "guarantors"), asserting two causes of actions: breach of the guaranty (as against all defendants) and violation of the implied covenant of good faith and fair dealing (as against all defendants). In motion sequence number 001, all defendants move to dismiss for failure to state a cause of action pursuant to CPLR 3211(a)(7) and based on documentary evidence pursuant to CPLR 3211(a)(1).
BACKGROUND
a. The Chrystie Street project and the JV action
Plaintiff was formed in 2013 to raise capital for the development of a project that included the construction of a new 28-story mixed-use commercial building, containing the 374-room PUBLIC Hotel and 11 residential condominium units (NYSCEF No. 2 at 2, 20). Later that [*2]year, plaintiff and 215 Chrystie Venture LLC (the "managing member") entered into the amended and restated limited liability company agreement (the "JV agreement") to form a joint venture called 215 Chrystie Investors LLC and govern the investment (id.).
Under the JV agreement, plaintiff invested $79.5 million as a preferred equity investment in the JV and was entitled to earn a return payable by the JV quarterly (id. at 7). The JV agreement also provided that distributions to the managing member could be made only if doing so would not adversely affect amounts due to plaintiff (id. at 29). The agreement also allowed the JV to incur debt only on commercially reasonable terms and in furtherance of the project (id. at 9, 30).
Plaintiff alleges that the managing member willfully breached these contractual obligations (id. at 7-9). Specifically, plaintiff alleges that the managing member loaded the project up with tens of millions of dollars of mezzanine debt that was not commercially reasonable nor in furtherance of construction of the PUBLIC Hotel (id. at 54-60). Moreover, plaintiff alleges that the managing member improperly paid itself and its member up to $78 million in distributions and $30 million in unearned fees (id. at 61-66, 70). It is also alleged that the managing member took steps to conceal that it had removed all of its equity in the JV, so that it could continue to improperly borrow funds (id. at 71-76). Then, in January 2020, the JV stopped paying plaintiff's quarterly preferred returns (id. at 41-49).
Soon thereafter, plaintiff provided the JV with notice that it was in default for failing to pay the preferred return, and then on February 18, 2021, plaintiff filed a lawsuit against the JV, managing member and its owners, including Witkoff and Schrager, and their respective companies ("the JV action"), alleging breaches of the JV agreement, unjust enrichment and tortious interference with contract. Defendants moved to dismiss for failure to state a cause of action, and the court issued a decision largely denying defendants' motion to dismiss, and finding, among other things, that plaintiff had stated sufficient facts to proceed with its claim for the breach of sections 4.04(a), 4.04(b) and 3.04(c) of the JV agreement.
b. The guaranty
In connection with the JV agreement, plaintiff also entered into a limited guaranty with the Witkoff Group LLC (the "TWG guarantor"), and IS Development LLC (the "ISC guarantor") (collectively, "guarantors" or "defendants") (id. at 3). Under the guaranty, defendants agreed to "irrevocably and unconditionally guarantee to PEP Member the payment and performance of the Guaranteed Obligations as and when the same shall be due and payable" (id. at 4). The "guaranteed obligations" are "the obligations or liabilities of the [JV] and/or [the Managing Member] to PEP Member for any loss, damage, cost, expense, liability, claim or other obligations incurred by PEP Member," including reasonable attorneys' fees and costs, arising out of or in connection with various enumerated acts of the Managing Member and/or the JV (id. at 5). Those acts include "willful misconduct by the [JV], its Subsidiaries and/or [the Managing Member] in connection with (i) their respective payment obligations to PEP Member set forth in the [JV] Agreement" (id. at 6). 
In this action, plaintiff maintains that the JV and managing member willfully breached the JV agreement by failing to pay plaintiff the quarterly preferred return; by entering into commercially unreasonable mezzanine loans which were not in the furtherance of the project; and by taking steps to conceal that the managing member had removed all of its equity in the JV. Such conduct on behalf of the JV and the managing member, plaintiff asserts, triggered plaintiff's rights and remedies under the guaranty against the guarantors, including its right to [*3]recover the overdue preferred quarterly returns and seek damages in the amount of the preferred equity (id. at 76,85). The JV and the guaranty contain a choice of law provision instructing the courts to apply the Delaware law to all disputes related to these agreements.
ARGUMENTS
Plaintiff alleges that the JV and/or managing member breached the JV agreement when it and/or they: failed to make the overdue preferred return payments in violation of section 4.04(a); engaged in a scheme to improperly siphon funds from the JV to the managing member in derogation of its preferred equity obligations under section 4.04(b); concealed and enacted their scheme to enter into loans that were not commercially reasonable nor for the construction of the hotel in violation of section 3.04(c). Plaintiff argues these actions constitute willful misconduct on behalf of the JV, which in turn triggers the guarantor's contractual liability under the guaranty. Plaintiff also argues that the guarantor's failure to pay the sums owned under the guaranty constitutes a breach of the implied covenant of good faith and fair dealing.
Pursuant to CPLR 3211(a)(1) and (7) and 3016(b), defendants move to dismiss the complaint in its entirety. First, defendants argue that the JV's failure to pay the preferred return as contemplated by section 4.04(a) of the JV agreement does not constitute willful misconduct. Defendants argue that, while "willful misconduct" is not a defined term in the guaranty or the JV agreement, the parties' use of the phrase in other contexts indicates that they did not view it to include a mere intentional breach of the JV agreement. Defendants further argue that sections 4.04(b) and 3.04(c) of the JV agreement are not payment obligations of the JV or managing member and that defendants' alleged failure to enter into commercially reasonable loans or to add plaintiff as a notice party cannot constitute willful misconduct "in connection with their respective payment obligations" to plaintiff under the guaranty. Finally, defendants argue that even if this court finds that guarantors breached the guaranty, plaintiff is not entitled to the damages it seeks given that defendants triggered a mandatory redemption date which delays defendants' payment obligations until April 6, 2025. According to defendants, considering that the JV agreement contains no acceleration clause, this means that the JV and guarantors cannot be found liable for any of the alleged breaches until the spring of 2025. Accordingly, defendants argue, the complaint must be dismissed as premature.
LEGAL STANDARD
On a motion to dismiss pursuant to CPLR 3211, "the pleading is to be afforded a liberal construction" and the court must "accept the facts as alleged in the complaint as true, accord plaintiffs the benefit of every possible favorable inference, and determine only whether the facts as alleged fit within any cognizable legal theory" (Leon v. Martinez, 84 NY2d 83, 87-88 [1994]). "Dismissal under CPLR 3211(a)(1) is warranted 'only if the documentary evidence submitted conclusively establishes a defense to the asserted claims as a matter of law'" (511 W. 232nd Owners Corp. v. Jennifer Realty Co., 98 NY2d 144, 152 [2002] (citing Leon, 84 NY2d at 88)). Under CPLR 3211(a)(7), "the moving party 'must convince the court that nothing the plaintiff can reasonably be expected to prove would help; that the plaintiff just doesn't have a claim'" (Natixis Real Est. Cap. Tr. 2007-HE2 v. Natixis Real Est. Holdings, LLC, 149 AD3d 127, 136 [1st Dep't 2017]).
DISCUSSION
1. Did the JV and/or managing member engage in actions that constitute willful misconduct, as contemplated by the guaranty?
In the complaint and moving papers, plaintiff argues that the JV — by virtue of failing to pay preferred returns and by entering into commercially unreasonable loans — has engaged in actions which fall squarely within the definition of the willful misconduct as contemplated by the guaranty. Defendants' principal defense is that plaintiff's pleadings cannot satisfy CPLR section 3016(b) and that, in any event, defendants' conduct was not severe enough to warrant the classification of willful misconduct. Although the term willful misconduct was never defined in the guaranty, defendants rely on multiple uses of the term in various contexts, within both the guaranty and the JV agreement, to advance the argument that the agreements never contemplated that a mere breach of a payment obligation, without more, could constitute willful misconduct.
Defendants are wrong. First, CPLR 3016(b) does not apply to plaintiff's claims because this case sounds in contract, not fraud or misrepresentation (see, e.g., Torchlight Loan Servs., LLC v. Column Fin., Inc., 42 Misc 3d 1236(A) [Sup. Ct. NY Cnty. 2014]) [plaintiff's claims for breach of contract based on failure to satisfy repurchase obligations after representations and warranties were shown to be false were "subject to New York's notice pleading standards, not CPLR 3016(b)"]. Thus, plaintiff is not required to satisfy a heightened pleading standard.
Defendants further argue that, based on the context, for an action to constitute willful misconduct, plaintiff must allege more than just a mere intentional breach of the JV agreement. Notably, both plaintiff and defendants rely on the context to infer the meaning of the term "willful misconduct" because the term was never defined in the guaranty.
To support their contention that the parties' use of the phrase in other contexts indicates that they did not view it to include an intentional breach of the JV agreement, defendants cite to section 5.03 of the JV agreement. Section 5.03 obligates the managing member to indemnify plaintiff against liabilities "in connection with the Company, the Property, or the Project," other than those "resulting from (a) any fraud or willful misconduct of [MCSDF] or any of its Affiliates or (b) any willful act of [MCSDF] or any of its Affiliates which constitutes a breach of the terms of this Agreement" (see Meister Aff., Ex. B, §5.03). Based on the phrasing of this section, defendants claim the parties distinguished between an intentional breach of the JV agreement and "willful misconduct," and where they intended that a provision cover both, they did so explicitly.
This interpretation of the guaranty must be rejected because it improperly relies on parol evidence — the JV agreement — rather than the express terms of the guaranty. Section 5.11 of the guaranty provides as follows:
THIS GUARANTY IS INTENDED BY GUARANTORS AND PEP MEMBER AS A FINAL AND COMPLETE EXPRESSION OF THE TERMS OF THE GUARANTY, AND NO COURSE OF DEALING BETWEEN GUARANTORS AND PEP MEMBER, NO COURSE OF PERFORMANCE, NO TRADE PRACTICES, AND NO EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OR OTHER EXTRINSIC EVIDENCE OF ANY NATURE SHALL BE USED TO CONTRADICT, VARY, SUPPLEMENT OR MODIFY ANY TERM OF THIS GUARANTY AGREEMENT The JV agreement here constitutes extrinsic evidence, which defendants cannot now use to alter the terms of the guaranty (Anguilla RE, LLC v. Lubert-Adler Real Est. Fund IV, L.P., No. CIV.A. N11C-10061MMJ, 2012 WL 5417101, at *5 [Del. Super. Ct. Nov. 5, 2012] ["[T]he parol evidence rule bars evaluation of the controlling documents on the basis of extrinsic [*4]evidence"] [citing Galantino v. Baffone, 46 A.3d 1076, 1081 [Del. 2012]]). Further, the guaranty only provides that "capitalized terms used [t]herein and not otherwise defined shall have the respective meanings ascribed thereto in the [JV] Agreement" (Guaranty § 1.2(a)) [emphasis added]). In the guaranty, "willful misconduct" is not capitalized — so its meaning cannot be imputed from the JV agreement.
To discern the meaning of the term "willful misconduct," defendants also argue the interpretive maxim "expressio unius est exclusio alterius," the expression of one thing is the exclusion of another. Defendants suggest that because one of the enumerated acts that triggers the guaranteed obligations is the managing member's failure to pay a break-up fee, any other payment obligation, including an obligation to pay quarterly preferred returns, would have been separately called-out as a guaranteed obligation. But this argument is contradicted by the plain language of the guaranty itself, which expressly enumerates "willful misconduct in connection with [any] payment obligations to PEP Member set forth in the [JV Agreement]" as an act that triggers the guaranteed obligations (Complaint at 36).
Since the term "willful misconduct" is not defined in the guaranty and since defendants' impressible cross-references to either separate and distinct agreements or inapplicable provisions of the guaranty are not helpful in defining the term, the court will turn to case law in order to define "willful misconduct".
In Kelly v. Blum, the Court of Chancery defined "willful conduct" as an action that is "[v]oluntary and intentional, but not necessarily malicious," in denying a motion to dismiss where the complaint alleged willful self-dealing (2010 WL 629850, *12 [Del. Ch. 2010] [citing Black's Law Dictionary]). The same court relied on a similar definition of "willful misconduct" in a different case holding that the complaint there adequately stated a breach of contract where the agreement provided for liability in cases of willful misconduct and the complaint pled the defendant "willfully declined to obtain [plaintiff's] consent on a number of issues as contractually required, and as a result unjustifiably burned through [plaintiff's] investment" (In re Cadira Grp. Holdings, LLC Litig., 2021 WL 2912479, *9 [Del. Ch. 2021]).
Consistent with definitions stemming from Kelly and Cadira cases, this court also adopts — at least for purposes of considering the within pre-answer motion to dismiss — a definition of "willful misconduct" as an action that is voluntary and intentional, but not necessarily malicious. Here, there is no real dispute that the complaint alleges that the JV and managing member intentionally breached section 4.04(a) of the JV agreement by refusing to pay the preferred return. The complaint alleges that "in defiance of the [JV] Agreement and flagrant disregard of PEP Member's invoices and letters, the JV and/or Managing Member refuse to pay sums over $12.4 million [now over $16 million] owed to PEP Member" in the form of preferred return payments (Complaint at 51). These allegations of voluntary and intentional wrongdoing satsify the requisite willful misconduct at the pleadings stage.
Plaintiff further argues that the JV and/or managing member's breaches of sections 4.04(b) and 3.04(c) of the JV agreement also trigger the guarantors' liability, as such breaches also constitute willful misconduct. Section 4.04(b) of the JV Agreement provides:
At such times as the [JV] has Available Cash, the Managing Member shall cause the [JV] to make a distribution of such Available Cash to the [Managing Member]; provided, however, that no distribution shall be made if the making of such distributions would adversely affect the [JV's] ability to pay any amounts due to [MCSDF] provided hereunder (including, without limitation, payment of the Preferred Return or the [*5]Origination Fee or a return of the PEP Capital Contributions), violate the Act, any restriction imposed by this Agreement or any loan agreement, debenture or promissory note or other material contract, agreement or instrument by which the [JV] is bound.
Section 3.04(c) provides that one of managing member's duties in conducting the JV's business is to:
[A]rrange for the Loans for the Project on commercially reasonable terms in furtherance of the Project Cost Statement, and provide and/or arrange for the provisions of all Guarantees required under all Loans, including without limitation guarantees of completion, non-recourse carve-outs, operating shortfalls, environmental indemnities, and any other required guarantees and indemnities[.]
Plaintiff argues that the JV breached section 4.04(b) by engaging in a scheme to improperly siphon funds from the JV to the managing member in derogation of its preferred equity obligations, and that it breached section 3.04(c) by entering into commercially unreasonable loans which were used to finance such scheme. Additionally, plaintiff argues, the JV also breached section 3.04(c) by failing to include plaintiff as a notice party on the referenced loans. According to plaintiff, such actions constitute willful misconduct arising from payment obligations in the JV agreement, further triggering the guaranty.
Defendants contend that sections 4.04(b) and 3.04(c) do not obligate the JV to make any payments, and that, therefore, a breach of those provisions could not possibly trigger guarantors' lability, which limits guarantors' obligations only to actions constituting "willful misconduct" "in connection with" JV's "payment obligations" to plaintiff.
To make this argument, however, defendants omit the relevant clause of section 4.04(b)—that the managing member may not make distributions to itself "if the making of such distributions would adversely affect the [JV's] ability to pay any amounts due[]" to plaintiff—including the preferred return and plaintiff's entire preferred equity (JV Agreement § 4.04(b) [emphasis added]).
Moreover, while section 3.04(c) of the JV Agreement may not by itself be a payment obligation, the JV and managing member's alleged breach of that section—omitting plaintiff as a notice party as they overloaded the JV with unreasonable debt—at a minimum contributed to the JV's inability to repay plaintiff's preferred equity, which is undisputedly a payment obligation. Nor do defendants cite any case law in support of their position that a notice provision can never be a payment obligation where, as here, it is alleged that a breach of the notice requirement led to default on payment obligations in the JV agreement.
Therefore, this court is satisfied that plaintiff has alleged sufficient facts that the JV's breaches of sections 4.04(a), 4.04(b) and 3.04(c) of the JV agreement constitute willful misconduct as contemplated by the guaranty, thereby triggering the guarantors' liability.
2. Does the mandatory redemption clause prohibit plaintiff from commencing this action before April of 2025?
Defendants further argue that even if the JV engaged in actions constituting willful misconduct, the JV is not "required or permitted" to redeem plaintiff's investment until April 6, 2025, under the plain language of the JV agreement, implying that plaintiff's claim should be dismissed as unripe.
Section 7.04(c) of the JV agreement states the following:
Prior to the Mandatory Redemption Date, the [JV] shall not be required or permitted to repay or return all or any portion of the unreturned PEP Capital Contributions and the interest of [MCSDF] may not be redeemed[.]
See Meister Aff., Ex. B, §7.03(c).8 (Emphasis added.)
It is at this point undisputed that, on January 7, 2020, managing member timely provided the requisite notice, duly extending the mandatory redemption date to April 6, 2025, to which plaintiff raised no objection. Defendants argue that their right to extend the payment date under section 7.03(a) is unconditional, and that plaintiff could have insisted that it be conditioned on the preferred return being current. Similarly, plaintiff could have negotiated the right to "accelerate" the mandatory redemption date should the JV fail to timely pay the preferred return. In the absence of such provision, the argument goes, defendants' payment obligation does not arise until April of 2025 and therefore no breach can occur until then. Accordingly, defendants imply that plaintiff's claims should be dismissed as unripe or premature.
Defendants' argument in this regard is not persuasive. Although the JV agreement contains no acceleration of the mandatory redemption date provision, plaintiff is allowed to commence this action prior to expiration of the mandatory redemption date. This is because, under the Delaware law, a cause of action accrues at the time of the wrongful act (ISN Software Corp. v. Richards, Layton & Finger, P.A., 226 A.3d 727, 732 [Del. 2020]). More specifically, "[f]or contract claims, the wrongful act occurs at the time a contract is breached" (id.). Thus, a breach of contract claim accrues "at the time the contract is broken, not at the time when actual damage results or is ascertained" (id.). This means that plaintiff is not obligated to wait until April of 2025 to pursue its breach of contract claim, because plaintiff's claim became ripe at the point when the contract was breached. And, according to the complaint, the JV has been in breach of various provisions of the JV agreement since 2016 through today.
And while the mandatory redemption provision is likely a critical factor in determining when defendants may become contractually obligated to pay damages, the provision does not mandate any delays with respect to plaintiff's right to bring a lawsuit and litigate an issue of defendants' liability. If anything, the provision provides a date that is relevant in the context of judgment enforcement proceedings, but, at this early stage of the case, where plaintiff is still trying to establish the existence of alleged breaches, the provision is not applicable. In other words, the mandatory redemption provision may delay plaintiff's right to receive damages until April of 2025, but the provision does not prevent plaintiff from litigating an issue of liability earlier.
Defendants also take issue with the exact amount of damages to which plaintiff claims it is entitled — arguing that the guaranty only provides for loss damages, as opposed to full-springing recourse damages. At the pleading stage, a complaint "need only state allegations from which damages attributable to the defendant's conduct may reasonably be inferred" (Fielding v. Kupferman, 65 AD3d 437, 442 [1st Dep't 2009]). Under this standard, plaintiff adequately alleges damages as a result of defendants' alleged breaches of the guaranty, including the loss arising from the guarantors' failure to satisfy their obligations based on the JV's willful misconduct. At this juncture, the court need not decide whether plaintiff is entitled to only a certain amount of damages (see Firefighters' Pension Sys. of the City of Kansas City, Missouri Tr. v. Presidio, Inc., 251 A.3d 212, 280 [Del. Ch. 2021] ["At the pleading stage, a plaintiff need not specify a monetary amount. The plaintiff can plead the existence of damages generally as long as the complaint supports a reasonable inference of harm"]; Morgan Stanley Altabridge Ltd. [*6]v. ESE Funding SPC Ltd., 60 AD3d 497, 497 [1st Dep't 2009] ["That the amount of damages, if any, is not yet known . . . does not preclude the assertion of plaintiff's contract claim"]). Accordingly, defendants' arguments to dismiss the complaint on the basis that plaintiff's claims are not ripe yet or because the damages are not yet properly ascertained are rejected.
3. Is plaintiff's claim for the breach of implied covenant of good faith and fair dealing duplicative of its contract claim?
The implied covenant of good faith and fair dealing inheres in all contracts governed by Delaware law and "requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain" (Dunlap v. State Farm Fire & Cas. Co., 878 A.2d 434, 442 [Del. 2005]). However, a breach of contract claim and a breach of good faith and fair dealing claim cannot both be asserted for the same conduct, unless "there is an independent basis for fiduciary claims arising from the same general events" (Edinburgh Holdings, Inc. v. Education Affiliates, Inc., 2018 Del. Ch. LEXIS 182 [Del. Ch. 2018]). In making this determination, the court "inquires whether the fiduciary duty claims depend on additional facts as well, are broader in scope, and involve different considerations in terms of potential remedy" (id.).
In this action, plaintiff's claims for breach of contract and breach of good faith and fair dealing arise from the same nucleus of facts — and state no additional facts and no significantly different damages or other remedies. Therefore, plaintiff's good faith claim is dismissed as duplicative.
Accordingly, it is
ORDERED that defendants' motion to dismiss plaintiff's cause of action for the breach of the guaranty is denied; and it is further
ORDERED that defendants' motion to dismiss plaintiff's cause of action for breach of the implied covenant of good faith and fair dealing is granted.
DATE 06/26/2023
ROBERT R. REED, J.S.C.